IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SIMONE WOODBERRY, | ) | CASE NO. 1:15-CV-0222 |
| | ) | |
| Petitioner, | ) | JUDGE SARAH LIOI |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | THOMAS M. PARKER |
| | ) | |
| Respondent. | ) | |
| | ) | **REPORT & RECOMMENDATION** |

## I.      Introduction

Plaintiff, Simone Woodberry ("Woodberry"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits under Title XVI of the Social Security Act ("Act") and Disability Insurance Benefits under Title II of the Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and REMANDED.

## II.      Procedural History

Ms. Simone Woodberry ("Woodberry") applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) disability on July 6, 2012.  (Tr. 275-289)  Ms. Woodberry's application was denied initially on September 25, 2012 (220-225) and after reconsideration on January 7, 2013.  (Tr. 231-243)  On January 17, 2013, Ms. Woodberry requested an administrative hearing.  (Tr. 244-245)

The administrative hearing took place before Administrative Law Judge (ALJ) Traci M. Hixson on October 15, 2013.  (Tr. 128-167)  On May 9, 2014, the ALJ issued a decision finding that Ms. Woodberry was not disabled.  (Tr. 111-127)  The Appeals Council denied review, thereby rendering the decision of the ALJ the final decision of the Commissioner. (Tr. 1-5)

On October 29, 2015, Ms. Woodberry filed an appeal of the ALJ's final decision with this court. (Doc. 1)  Defendant answered and filed the transcript of the administrative proceedings on December 30, 2015. (Docs. 10 and 11)  Plaintiff Woodberry filed her brief on the merits on February 28, 2016 (Doc. 14) and Defendant filed her  brief on the merits on April 26, 2016 (Doc. 16), making the matter ripe for this court's review.

## III.    Evidence

### A.   Personal, Educational and Vocational Evidence

Ms. Woodberry was born on November 12, 1968 and was 43 years old on the date her application was filed.  (Tr. 275)  She has lived with her mother since she divorced in 1998.  (Tr. 276)  Ms. Woodberry graduated from high school.  (Tr. 132)  She had past relevant work as a data entry clerk; assistant manager of sales; and a collections clerk.   (Tr. 121)

### B.   Medical Evidence

In October 2010, plaintiff underwent a physical examination, which revealed no arthritic pain, no joint swelling, and no muscle weakness.  (Tr. 527)  Plaintiff is five feet tall.  At the time of the exam she weighed 239 pounds and reported pain when raising her left arm over her head. (Tr. 527)  Radiology images of plaintiff's left shoulder taken on October 26, 2010 revealed no fracture, dislocation or bone destruction and her adjacent soft tissues were unremarkable.  (Tr. 507)

2

Office notes from an appointment on November 4, 2010 indicate that plaintiff had almost full range of motion but was unable to fully lift her arm above her head.  (Tr. 519)  Plaintiff was referred to a pain specialist for her shoulder pain.  (Tr. 519)

On January 18, 2011, plaintiff began physical therapy for left shoulder pain. (Tr. 513) Plaintiff is left hand dominant.  (Tr. 503)  On February 17, 2011, she reported experiencing difficulty with dressing, hair care, self-care and other activities of daily living due to the pain in her left shoulder. (Tr. 503)

On February 8, 2011, plaintiff sought treatment from Dr. Murray A. Greenwood.  (Tr. 506)  She reported that physical therapy was improving her symptoms.  (Tr. 506)  She described her pain level as a 5/10, an improvement from 9/10, which was the pain level she had previously reported.  (Tr. 506)  Plaintiff denied any pain in her neck or hand.  (Tr. 506)

At physical therapy in April 2011, plaintiff reported that her shoulder pain was 4/10 and her neck pain was 7/10. (Tr. 494)  The ultrasound treatment she received during the appointment reduced plaintiff's pain to almost 0-1/10.  (Tr. 494)  X-ray images of plaintiff's thoracic spine taken in June 2011 showed no acute fractures and normal alignment.  (Tr. 1275)

In August 2011, plaintiff had a follow-up appointment with Dr. Greenwood and reported that her neck, back and shoulder pain were much better.  (Tr. 486)  Her migraine frequency had decreased to one time per week and over-the-counter medication resolved her headaches within thirty minutes.  (Tr. 486)  Dr. Greenwood's physical exam returned positive findings for protracted neck, mild tenderness to palpation in the left trapezius, left acromioclavicular joint and left biceps tendon, and positive for mild Neer and mild Hawkins testing.  (Tr. 489-490)

Dr. Greenwood's notes from October 25, 2011 document thoracic spine X-rays showing osteophytic bridging in the mid-dorsal thoracic region.  (Tr. 451)  An increase in plaintiff's

3

headache medication resulted in a chronic urticarial condition. (Tr. 410)

In July 2012, plaintiff requested another referral to pain management for her shoulder. (Tr. 381)  Plaintiff noted that the pain management had helped her in the past. (Tr. 381)  On physical exam, she could not raise her left arm over her head. (Tr. 381)  Plaintiff reported that she was still having migraine headaches.  (Tr. 381)

At a follow up appointment with nurse, Diana Lisuch, on August 27, 2012, plaintiff reported that she was still having headaches.  (Tr. 651)  Plaintiff had a normal neurological examination and Nurse Lisuch adjusted plaintiff's medications and referred her to a neurologist. (Tr. 651)

X-ray images of plaintiff's cervical spine taken on September 6, 2012 showed mild multi-level degenerative disc disease, particularly at C5-C6, but plaintiff's soft tissues were normal. (Tr. 587)  Plaintiff's joint spaces were maintained and there were no significant arthritic changes, no abnormal bursa or tendon calcifications.  (Tr. 1274)

At an appointment with Dr. Greenwood on September 6, 2012, plaintiff complained of right shoulder and neck pain. (Tr. 637)  Dr. Greenwood noted that plaintiff moved easily from a sitting to standing position and was able to transfer to the exam table. (Tr. 640)  He also noted that she was obese.  (Tr. 637)  Plaintiff was diagnosed with rotator cuff impingement syndrome, myofascial pain syndrome in the cervical region and facet syndrome.  (Tr. 641)

At an appointment with a neurologist on September 6, 2012, plaintiff complained of increasing headaches that were sensitive to light and sound.  (Tr. 630)  Plaintiff reported that she had been on Elavil and had not had any headaches so far that week.  (Tr. 630)  A physical exam revealed that plaintiff had a normal gait, her strength was 5/5, and there were no abnormalities in her neurologic examination. (Tr. 633)

Plaintiff returned to Nurse Edwards in October 2012 complaining of continued headaches and pain all over. (Tr. 607)  Nurse Edwards prescribed Topamax for the headaches because plaintiff had stopped taking Elavil.  (Tr. 607- 610)

Ms. Woodberry underwent physical therapy in October and November 2012. (Tr. 556-585)  At a follow-up appointment with Dr. Greenberg on October 18, 2012, plaintiff reported that physical therapy was not very helpful and that she was having increasingly frequent and severe migraine headaches. (Tr. 586)  Dr. Greenwood's notes indicate that x-rays of her neck showed only mild degenerative changes and x-rays of her left shoulder showed no fracture, dislocation or bone destruction.  (Tr. 595)

On November 23, 2012, x-ray images were taken of both of plaintiff's knees.  (Tr. 1013)  The x-rays showed moderate to severe osteoarthritis of the left knee and mild to moderate osteoarthritis of the right knee.  (Tr. 1013)  Images of plaintiff's hands and wrists showed no evidence of radiculopathy or neuropathy in her wrists or in the ulnar nerve. (Tr. 1274)  An EMG of the upper extremities showed no abnormalities.  (Tr. 936)   In a follow up appointment on November 23, 2012 Dr. Greenberg gave plaintiff an injection to her right shoulder to reduce pain.  (Tr. 952)

On December 10, 2012, plaintiff reported to her neurologist that the migraine medication was helping and that her headaches had decreased to one time per week. (Tr. 967)  However, she was experiencing some forgetfulness and poor concentration.  (Tr. 967)  Plaintiff's motor strength was documented as a 5/5 and her gait was normal. (Tr. 970)

On January 4, 2013, plaintiff complained that she could only sit for 20 minutes before experiencing back and neck pain. (Tr. 1081)  However, Dr. Greenwood noted that he observed plaintiff sitting comfortably for approximately 30 minutes during the interview portion of the

5

assessment. (Tr. 1081) These notes also state that physical therapy "helps a bit." (Tr. 1081)

On February 8, 2013, plaintiff reported to Dr. Greenwood that she was continuing to have numbness in her arms and hands. In March 2013, she was diagnosed with Celiac disease. (Tr. 1181) On March 29, 2013, plaintiff reported to Dr. Greenwood that she had begun classes for chronic pain management and was attempting physical therapy. (Tr. 1188) On examination, Dr. Greenwood noted that she had mildly decreased strength in her right deltoid, positive Neer sign, tenderness and crepitus in her knee. (Tr. 1193) He diagnosed right shoulder impingement, neck and thoracic axial pain with facet features and bilateral knee osteoarthritis. (Tr. 1193) Dr. Greenwood advised her to take Topamax and to start a pool exercise program. (Tr. 1188, 1193)

In May 2013, plaintiff reported ongoing intermittent weakness in her hands. (Tr. 1231) In June 2013, plaintiff saw her neurologist for ongoing headaches, which had improved, but she reported worsening of the weakness in her hands, which was causing her to drop things. (Tr. 1256) She also complained about sharp pains in her back and neck. (Tr. 1256) Plaintiff rated her pain as 7/10. (Tr. 1258) Physical examination revealed motor strength was 5/5 but plaintiff had decreased pin sensation to the fifth digit of her right hand, positive Hoffman bilaterally in her upper limbs (right greater than left). (Tr. 1259) The physician questioned whether the headache prescription, Topamax, might be causing the numbness and weakness in plaintiff's hands. (Tr. 1259)

In June 2013, plaintiff sought treatment from registered nurse, Tonya Rogers, for shoulder and neck pain. (Tr. 1272) Plaintiff was advised to continue her medications, including Topamax for treating her migraines. (Tr. 1273) Also in June 2013, an MRI of plaintiff's cervical spine showed no evidence of cervical cord compression. (Tr. 1287) There was a minimal central bulge, mild spurring without cord or nerve root compression, mild degenerative

6

end-plate irregularity, and no focal nerve root compression. (Tr. 1263)  Overall, the images showed mild cervical spondylosis and no cord compression.  (Tr. 1263)

In July 2013, plaintiff reported that her headaches were less severe and that she had two headaches since her last appointment with her neurologist.  (Tr. 1303)  Plaintiff reported that it hurt to sit for long periods and that she had cramping and numbness in her hands. (Tr. 1303) Plaintiff reported that she was no longer using a cane and her knees and legs were feeling better. (Tr. 1304)  Her motor strength was reported as 5/5 in her arms and legs, her sensation, coordination and gait were all documented as normal.  (Tr. 1305-1306)

On August 6, 2013, a physical examination by Dr. Greenwood also revealed positive snapping of the extensor tendon over plaintiff's right D4 MCP and it was not triggering.  (Tr. 1331)

Plaintiff also sought treatment with Judith Weiss in August 2013.  (Tr. 1233)  Although it appears that the plaintiff was seeking treatment with Dr. Weiss due to irregular menstruation, Dr. Weiss's notes state that plaintiff's range of motion was normal, her muscular strength was intact and her grip strength was 5/5 in both hands.  (Tr. 1233)  Plaintiff's weight was 260 pounds and she was described as morbidly obese.  (Tr. 1233)

Also in August 2013, at an appointment at her neurologist's office, plaintiff reported having five migraines in the last month, which lasted all day and were sensitive to light and sound.  (Tr. 1340)  On examination, she had decreased sensation to all fingers except the 2nd digit on her left hand. (Tr. 1343)  Nurse Edwards recommended that plaintiff stop taking Topamax to rule it out as the cause of her hand numbness.  (Tr. 1343)

At her next visit on September 10, 2013, after she stopped taking Topamax, plaintiff reported a significant increase in her migraine headaches, which were now occurring 3 to 4 days

7

per week. (Tr. 1394) She reported that her memory was improved but her hands were tingling. (Tr. 1394) She continued to have decreased pin prick sensation in both hands with positive Hoffman's testing. (Tr. 1397) An MRI of plaintiff's brain returned normal results. (Tr. 1430)

On September 18, 2013, plaintiff's nutritionist questioned whether plaintiff actually had Celiac disease. (Tr. 1413) The nutritionist thought that plaintiff may only have a gluten sensitivity and a severe lactose intolerance. (Tr. 1413)

On September 24, 2013, plaintiff followed up with her neurologist. (Tr. 1437) Plaintiff's motor strength was recorded as 5/5 and she could heel-toe walk but she could not deep knee bend and could only squat approximately a quarter of the way down. (Tr. 1441)

Plaintiff's brief states that, after the ALJ's decision was issued but before the decision of the Appeals Council was issued, "Ms. Woodberry underwent additional testing which revealed that she had bilateral arthritic cysts in the carpal bones, consistent with intermittent inflammation." (Doc. 14, p. 8)

### C. Opinion Evidence

#### 1. Treating Physician – Murray Greenwood, M.D. – January 2013

On January 5, 2013, Dr. Greenwood completed a questionnaire regarding plaintiff's physical capacity. (Tr. 1173-74) He opined that she could occasionally lift 10-20 pounds and could frequently lift 10 pounds. (Tr. 1173) He found that plaintiff could stand and/or walk for 1-2 hours per day and for 10-15 minutes without interruption. (Tr. 1173) He opined that she could sit for 2-3 hours per day and for 15-20 minutes without interruption. (Tr. 1173) However, he noted that the reported tolerance appeared to be out of proportion with the x-ray findings. (Tr. 1173) He limited her abilities to occasionally climbing, balancing, stooping, reaching and pushing/pulling. (Tr. 1173-74) He stated that she could rarely crouch, kneel or crawl. (Tr. 1173)

8

He opined that she could frequently perform work involving fine manipulation and gross manipulation.  (Tr. 1174)  Dr. Greenwood noted that plaintiff had been prescribed a cane, needed to be able to alternate between sitting, standing and walking at-will and experienced moderate pain.  (Tr. 1174)  As to her pain, however, he noted that it was subjective and he was unable to comment on whether it would interfere with her work.  (Tr. 1174)

### 2.  Consulting Physician – Dr. Antwon Morton – September 2013

On September 27, 2013, Dr. Antwon Morton examined plaintiff and her records and completed a Functional Capacity Assessment regarding Ms. Woodberry's physical tolerances. (Tr. 1458-1465)   Dr. Morton opined that plaintiff was able to lift 10-15 pounds to waist level but noted that she should avoid lifting from the floor and that she had significant pain when lifting. (Tr. 1321)  He believed she was able to stand and walk or sit for 1-2 hours during the day and 20 minutes at a time.  (Tr. 1321)  He opined that plaintiff could rarely climb, balance, stoop, crouch, kneel, or crawl.  (Tr. 1321)  He also stated that plaintiff should alternate between sitting, standing and walking at will and should have the option of elevating her legs 90 degrees up to 120 degrees.  (Tr. 1321-1322)  He opined that she would require 2-3 hours of rest or extra breaks every day due to her pain.  (Tr. 1321-1322)  He noted that she needed a cane for balance, would rarely be able to reach, push, pull and perform gross manipulations but could occasionally perform fine manipulations. (Tr. 1321-1322)   Dr. Morton opined that plaintiff would struggle to perform work at the sedentary level and that she should "seriously be considered a candidate for disability."  (Tr. 1465)

### 3.  Reviewing Physician – Leigh Thomas, M.D. – January 2013

Dr. Leigh Thomas reviewed plaintiff's records on January 3, 2013 on behalf of the

agency. (Tr. 212-215)  Dr. Thomas opined that plaintiff could perform a reduced range of light

work with limited overhead reaching with her left hand.  (Tr. 212-213)

### D.  Testimonial Evidence

#### 1.  Ms. Woodberry's Testimony

A hearing for the present social security appeal was held on October 15, 2013.  (Tr. 128)

Ms. Woodberry testified that she was born on November 12, 1968.  (Tr. 131)  She was 5'1", and

weighed 238 pounds at the time of the hearing.  (Tr. 148)  She testified that she had been losing

weight because she was on a gluten-free diet. (Tr. 148)  She lived in Cleveland, Ohio with her

mother. (Tr. 131)  She did not drive and had never had a driver's license. (Tr. 132)  Ms.

Woodberry graduated from high school. (Tr. 132)  She testified that she did not drink alcohol or

smoke or use any illegal substances. (Tr. 132)

Ms. Woodberry stated that her mother prepared meals, washed dishes, and did laundry

for her.  (Tr. 132)  Her mother also did the shopping because plaintiff's hands would go numb

and she would drop things sporadically.  (Tr. 133)  Ms. Woodberry was able to make her own

bed and bathe/shower herself.   (Tr. 133)

Ms. Woodberry testified that she did not have any hobbies because her medications

caused her to sleep all of the time. (Tr. 133)  She liked to listen to music but did not watch

television. (Tr. 134)   She also stated that she attended church once a month. (Tr. 134)  Friends

or family would visit her because she was not able to get out much. (Tr. 134)

Ms. Woodberry stated that she typically woke up around 9:00 or 10:00 and took a

shower.  (Tr. 134)  Her mother prepared breakfast for her, then Ms. Woodberry would take her

medication, exercise, read and then she would feel sleepy.  (Tr. 134)  She would then take a nap

for about an hour or so. (Tr. 134)   After that, she talked with her mom or sometimes talked on

the telephone.  (Tr. 135)  Woodberry stated that she only left the house to go to doctor's appointments, church or to sit in the car while her mom shopped for groceries.  (Tr. 136)

Woodberry last worked in March 2013 doing collection work over the telephone.  (Tr. 136)  She testified that she made $12 an hour and worked 40 hours a week.  (Tr. 137)  She stopped working at that job because her shoulder was hurting and the assignment was complete through the temporary agency.  (Tr. 137)  Woodberry worked for another temporary agency and was assigned to customer service for American Express.  (Tr. 138)  At American Express, plaintiff collected information related to car insurance over the phone, entered it into a computer system and completed any necessary paperwork. (Tr. 138-139)

Ms. Woodberry testified that she also worked in the collection department for home equity loans for Chase Home Finance.  (Tr. 139)  She also worked full time as an assistant manager for Gorant Candies in the late 1990's.  (Tr. 140)  As an assistant manager, Woodberry trained new employees on displaying the cards and went over daily sales with the manager. (Tr. 140)  Also, if she worked the night shift, she closed out the cash register and made deposits at the bank. (Tr. 141)

Woodberry testified that she was no longer able to work because of physical impairments with her legs.  (Tr. 141)  She could not stand for longer than 20 minutes and walked with a cane.  (Tr. 141)  The pain felt like a needle stabbing her in both legs.  (Tr. 141)  She also felt like something was pulling on the back of her knees and that she was going to fall. (Tr. 142)  Her right leg was very weak and she had constant sharp pain in her thighs.  (Tr. 142)  She did home exercises consisting of raising her leg up and down and back and forth while in bed.  (Tr. 143)

Ms. Woodberry also testified that both of her hands would sporadically go numb and things would fall out of her hands because she could not feel or grip things.  (Tr. 142-143)  One

11

time when she was cooking, she did not feel herself getting burnt.  (Tr. 142)  For this reason, she

was no longer able to cook.  (Tr. 142)  When her hands were not numb, she was able to use

utensils and write with a pen.  (Tr. 150)  She stated that she could no longer lift something up

over head because of her shoulders and the pain she experienced across her body. (Tr. 150-151)

Ms. Woodberry testified that she also had stabbing pain in her shoulders. (Tr. 143)  She

could not sit for longer than 30-40 minutes because of pain in her spine and neck.  (Tr. 143)  If

she looked to the right or left or up or down, she experienced a sharp burning pain in her neck.

(Tr. 143)  She experienced pain when moving her neck and when in a stationary position, such as

when she looked at a computer screen.  (Tr. 154)   She felt a burning sensation on the back of her

neck with any movement.  (Tr. 155)

Ms. Woodberry stated that she also had chronic migraines.  (Tr. 143)  A prescription of

Topamax had helped with her migraine headaches. (Tr. 144)  However, after she stopped taking

Topamax, she was having about six migraines a week. (Tr. 144)  She testified that she used to be

self-sufficient and independent but felt depressed now that she was required to rely on others for

help.  (Tr. 144)

Ms. Woodberry had received one injection in her shoulder but felt that it made things

worse. (Tr. 145)  She did not feel that physical therapy had helped and did not use a TENS unit

because she was unable to put it on by herself.  (Tr. 145)  She had also tried Voltaren cream and

Gabapentin but continued to feel a tearing or pulling in her back.  (Tr. 145)  At the time of the

hearing, she was seeing Dr. Morton at Pain management and Rehabilitation and had previously

seen Dr. Greenwood.  (Tr. 146)

Plaintiff testified that she was going to a glaucoma specialist next month. (Tr. 146)  She

also had insomnia about three to four times per week which made her feel fatigued. (Tr. 146)

She had low blood pressure but the cause of that had not been determined yet.  (Tr. 146)  She

was taking Neurontin, Topamax, Nexium, Voltaren, Flexeril, Mobic, Nortriptyline and Zyrtec.

(Tr. 147)

Ms. Woodberry testified that she had also been diagnosed with GERD, which had caused

her to lose her voice for three days to a week at a time, usually once per year.  (Tr. 147)

Prescriptions for Nexium and Zyrtec had helped with that condition. (Tr. 147)  She was also

taking B-12 vitamins because of gastric bypass surgery that she had nine years ago.  (Tr. 148)

Plaintiff testified that she had cysts on her left and right ovaries and fibroids on her uterus

which caused her abdominal pain and discomfort.  (Tr. 148)  She had been diagnosed with

polycystic ovary syndrome.  (Tr. 149)  In June of 2012, she had surgery to remove a cyst and to

address an infection at the suture site of her gastric bypass surgery.  (Tr. 148)

Ms. Woodberry testified that she did not go up or down stairs due to a pulling feeling in

the back of her knees.  (Tr. 149)  She used ramps or elevators instead.  (Tr. 150) Ms. Woodberry

experienced swelling in her knees and legs three or four days out of the week. (Tr. 154)  When

that happened, she had to put her feet up and stay off of her legs. (Tr. 154)

When questioned by her attorney, Ms. Woodberry stated that the straight cane she used

was prescribed by Dr. Greenwood.  (Tr. 151)  She also stated that she was not in any type of

physical therapy at that point but did home exercises. (Tr. 152)  She did not know which

medicine caused her to feel tired during the day. (Tr. 152)  Woodberry believed that Neurontin

made her feel anxious. (Tr. 152)  She also had difficulties with her memory and concentration

which began mid-summer prior to the hearing.  (Tr. 152)  She was not able to remember things,

like her own phone number.  (Tr. 153)  She also forgot names and had trouble concentrating

even while just talking to someone.  (Tr. 153)  She underwent an MRI to determine if she had

13

MS or any problems with her brain but the results were negative.  (Tr. 153)

### 2.  Vocational Expert's Testimony

Vocational Expert ("VE"), Dr. Robert A. Mosley, testified at the hearing.  (Tr. 155-167)
The VE considered plaintiff's past relevant work to be a data entry clerk; a telephone solicitor;
an assistant manager of retail sales; and a collections clerk.  (Tr. 158-159)

For the first hypothetical question, the ALJ instructed the VE to consider a hypothetical
individual the same age as Ms. Woodberry with the same education and employment
background.  (Tr. 159)  He was asked to further assume that the individual could lift and carry 20
pounds occasionally and ten pounds frequently; the person could stand and walk for six hours
and could sit for six hours.  (Tr. 159)  The person could frequently push and pull with the left
upper extremity and there was no limitation on the right.  The person could climb stairs and
ramps, could stoop, kneel and crouch, occasionally crawl, frequently balance, could occasionally
lift overhead with left upper extremity, the dominant arm, but there were no limitations on the
non-dominant arm for overhead and bilateral reaching.  (Tr. 159)  The individual could not be
exposed to hazardous conditions.  (Tr. 160)  The hypothetical individual would be further limited
to frequently reaching with the dominant arm overhead but no limitations for reaching in front
and no reaching limitations for the non-dominant arm.  (Tr. 160)

The ALJ asked the VE if the hypothetical individual could perform any of the past jobs of
Ms. Woodberry.  (Tr. 160)  In response, the VE stated that the hypothetical individual could
perform the following past jobs of Ms. Woodberry:  data entry, telephone solicitor, assistant
manager and collections clerk.  (Tr. 160-161)

For the second hypothetical, the ALJ asked the VE to consider a hypothetical individual
who could lift and carry ten pounds occasionally, could stand and walk for two hours; sit for six

hours but would need a sit/stand option every hour for about five minutes but would not have to leave the work station to do so.  (Tr. 161)  The person could occasionally climb stairs and ramps, bend, balance and stoop but could not kneel or crawl.  The person could occasionally reach in all directions bilaterally and could occasionally push or pull with the upper extremities.  This person could handle, finger and feel and would require the use of a cane when walking and standing. (Tr. 161)  Finally, this individual could not be exposed to hazardous conditions.  (Tr. 161)

The ALJ asked the VE if this hypothetical individual could perform any of the past jobs of Ms. Woodberry.  (Tr. 161)  In response, the VE stated that this hypothetical individual could perform the telephone solicitor position if frequent reaching and handling were changed to occasional reaching and handling.  (Tr. 161-162)  The VE opined that this hypothetical individual could also perform telephone solicitor now that this type of work is more computerized and could be considered occasional reaching.  (Tr. 162)  Three thousand people were employed in northeast Ohio in the telephone solicitor position; 10,000 in the State of Ohio and over 500,000 nationally.  (Tr. 162)

The VE opined that this individual could also perform the following positions:  a surveillance system monitor with 1,200 people employed in northeast Ohio; over 6,000 in the State of Ohio and over 100,000 nationally; and a cashier II, specifically in a cafeteria, parking lot of a garage or in a dining room.  That position had 2,500 people employed in northeast Ohio, over 10,000 in the State of Ohio and over 200,000 nationally.  The VE stated that those positions could be performed sitting or standing.  (Tr. 163)

For the third hypothetical, the ALJ asked the VE if the hypothetical individual could perform those jobs if the handling and fingering were reduced to occasional.  (Tr. 163)  The VE responded that the cashier II position(s) would be impacted but not the telephone solicitor or the

surveillance system monitor.  (Tr. 163)

For the fourth hypothetical, the ALJ asked if the VE's opinion would be different if the hypothetical individual needed to elevate her legs below waist level whenever seated.  (Tr. 163) The VE said that the individual would not be able to perform the same positions because elevating her legs would impact her ability to perform the duties associated with the jobs.  (Tr. 164)  The VE opined that the individual would be able to lift her feet off the floor a little, but beyond that, it would become difficult to perform the jobs he identified.  (Tr. 164)  The VE pointed out that elevation of legs and the sit/stand options were not addressed by the DOT.  (Tr. 164)

Counsel for Ms. Woodberry asked the VE about the leg elevation limitation.  (Tr. 165) She also asked the VE if the jobs he identified would be impacted if the sit/stand option were changed to a sit/stand/walk option, meaning the individual could get up and move around.  (Tr. 165)  In response, the VE opined that there were no jobs that could be performed by the hypothetical individual because the individual would be off-task too much.  (Tr. 166)

Counsel for Woodberry then asked the VE to reconsider hypothetical number three adding the limitation that the worker would be consistently absent two days per month.  (Tr. 166) The VE stated that such a hypothetical person would have a hard time maintaining employment in the jobs he identified in both the local and national economy.  (Tr. 166)

## IV.     Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy. *Id.*

**V.     The ALJ's Decision**

The ALJ issued a decision on May 9, 2014.  A summary of her findings is as follows:

1.  Ms. Woodberry met the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 116)

2.  She had not engaged in substantial gainful activity since March 31, 2010, the alleged onset date.  (Tr. 116)

3.  Ms. Woodberry had the following severe impairments: obesity, migraine headaches, myofascial pain dysfunction syndrome, degenerative disc disease of the cervical and thoracic spine, degenerative joint disease of the bilateral knees, and obstructive sleep apnea.  (Tr. 116)

4.  Ms. Woodberry did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 117)

5.  She had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she could lift or carry up to 10 pounds occasionally, stand or walk for two hours out of eight, and sit for six hours out of eight with sit/stand options every hour for five minutes without leaving her workstation.  She could occasionally push or pull with the upper extremities.  She could occasionally climb stairs and ramps, bend, balance or stoop; she could never kneel or crawl.    She could occasionally reach in all directions bilaterally; she could handle, finger or feel. She needed a cane when standing or walking and she could have no exposure to hazards.  (Tr. 118)

6.  Ms. Woodberry was unable to perform any past relevant work.  (Tr. 121)

7.  She was born on November 12, 1968 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability date.  Her age category subsequently changed to a younger individual age 45-49.  (Tr. 121)

8.  Ms. Woodberry had at least a high school education and was able to communicate in English.  (Tr. 121)

9. Transferability of job skills was not material to the determination of disability because Ms. Woodberry was not disabled, whether or not she had transferable job skills.  (Tr. 121)

10. Considering Ms. Woodberry's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform.  (Tr. 121)

Based on these findings, the ALJ determined that Woodberry had not been under a disability from March 31, 2010 through May 9, 2014 (the date of the ALJ's decision).  (Tr. 122)

## VI.    Parties' Arguments

Plaintiff filed her brief on February 28, 2016.  Plaintiff argues that the ALJ failed to assign appropriate weight to the opinions of plaintiff's treating physician, Dr. Greenwood and to the examining psychiatrist, Dr. Morton.  (Doc. 14, pp. 10-12)  Plaintiff also contends that the ALJ's assessment of residual functional capacity failed to account for the severe impairment of migraine headaches.  (Doc. 14, pp. 13-14)

Defendant filed her brief on April 26, 2016.  Defendant contends that the ALJ properly considered the opinion evidence and the plaintiff's headache pain when assessing her residual functional capacity.  (Doc. 16, pp. 10-16)  The undersigned has considered the parties' arguments and his recommendation follows.

## VII.   Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or

19

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

 The Act provides that "the findings of the Commissioner of Social Security as to any fact,

if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3).

The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762,

772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v.*

*Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also

support another conclusion, the decision of the Administrative Law Judge must stand if the

evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270,

273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing*

*Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

 In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th

Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported

by substantial evidence, however, a decision of the Commissioner will not be upheld where the

SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.  Treating Physician Rule

#### 1.  Dr. Greenwood's Opinion

The ALJ acknowledged that Dr. Greenwood was plaintiff's treating physician and indicated that she had given "considerable weight" to his opinion. (Tr. 120)  However, plaintiff argues that the ALJ ignored Dr. Greenwood's finding that plaintiff required a sit/stand/walk at-will limitation.  (Doc. 14, p.11)  Plaintiff further contends that, by improperly discounting this limitation, the ALJ committed prejudicial error because the VE testified that an individual requiring an at-will sit/stand/walk option would have difficulty sustaining employment.  (Tr. 165)  Plaintiff argues that the ALJ erred in ignoring portions of Dr. Greenwood's opinion and in failing to provide good reasons for doing so.

The administrative regulations implementing the Social Security Act impose standards on

the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence,

even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> The conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id*. at 377.  On the other hand, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis."  See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Regarding Dr. Greenwood's opinion related to plaintiff's physical capacity, the ALJ stated:

> Dr. Greenwood opined that the claimant was limited to lifting and carrying 10-20 pounds occasionally, standing/walking for one to two hours, sitting for two to three hours, with no need for breaks.  He further noted that claimant's pain was subjective, and he could not comment on its effects on her sustainability, and that her reports of sitting tolerance are out of proportion to the findings.  The

23

> undersigned gives the opinion considerable weight, and limits the claimant to two
> hours of standing/walking.  Dr. Greenwood is a treating source, and the
> osteoarthritis in her knees could reasonably limit her to sedentary work.
> However, the undersigned agrees that her allegations of sitting intolerance are not
> support [sic], and does not accept his opinion.  Specifically, his documentation of
> her overstating of sitting intolerance is noted.

(Tr. 121)

The ALJ chose not to assign controlling weight to plaintiff's treating physician, Dr. Greenwood.  While the ALJ purports to have given considerable weight to Dr. Greenwood's opinion, she rejected his opinion that plaintiff was limited to two to three hours of sitting per day and that she required the option of being able to sit, stand and walk at-will.  This is significant because the VE testified that the option of being able to walk at-will would prevent an individual from being able to perform the jobs he had identified when questioned by the ALJ.

Moreover, the ALJ failed to provide a sufficient explanation for rejecting Dr. Greenwood's opinion regarding plaintiff's ability to sit and the requirement of an at-will sit/stand/walk option.  The ALJ acknowledged that Dr. Greenwood was a treating physician. However she did not discuss the length of the treatment and frequency of the treatment relationship.

The ALJ also did not adequately explain how Dr. Greenwood's opinion was not supported by medical evidence or the record.  While the ALJ states that Dr. Greenwood's opinion regarding the sitting intolerance was not supported, she does not provide an adequate explanation for this finding.  Earlier in her decision, the ALJ points out that Dr. Greenwood's notes state that he had observed plaintiff sitting comfortably for 30 minutes, despite plaintiff's complaint that she could only sit for 20 minutes at a time.  (Tr. 120, 1081)  While this medical record might support a finding by the ALJ that plaintiff could sit comfortably for 30 minutes at a

24

time, despite Dr. Greenwood's opinion that she could only sit for 20 minutes at a time, this statement does not support the ALJ's finding that the plaintiff could sit for six hours a day with a stand at her workstation option every hour.  Similarly, the ALJ's reliance on Dr. Greenwood's vague note that the x-ray of plaintiff's spine did not support her reported tolerance, does not support the ALJ's findings regarding plaintiff's ability to sit.  The ALJ has not provided an adequate explanation for her findings regarding plaintiff's ability to sit for six hours every day or her rejection of Dr. Greenwood's opinion that plaintiff required an at-will sit/stand/walk option throughout the day.

The purpose of the "good reasons" requirement is two-fold.  First, a sufficiently clear explanation, "lets the claimants understand the disposition of their cases," particularly where a claimant knows that her physician has deemed her disabled and therefore "might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Rogers,* 486 F.3d at 242 (quoting *Wilson* 378 F.3d at 544).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may be considered "harmless error."  These circumstances are present where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation. "*Wilson,* 378 F.3d at 547. *See also Cole,* 661 F.3d at 940.  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the

"supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.  *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010).  "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused."  *Friend,* 375 Fed. Appx. at 551.

Here, the reasons given by the ALJ to support discounting the opinion of plaintiff's treating physician are inadequate.  Moreover, she did not fully consider all of the elements contemplated by 20 C.F.R. § 416.927(c)(2)-(6) including the supportability of Dr. Greenwood's opinion.   For these reasons, the undersigned finds that the ALJ's failure to provide sufficiently specific "good reasons" for discounting Dr. Greenwood's opinion as to the limitations of Ms. Woodberry was not harmless error.  Even if there were good reasons to reject the treating physician's opinion, the ALJ failed to articulate those reasons with sufficient specificity so as to allow for meaningful review.  Accordingly, the court should reject the ALJ's determination.

### 2.    Dr. Morton's Opinion

Plaintiff also argues that the ALJ failed to identify the weight to be assigned to Dr. Morton's findings regarding plaintiff's abilities.  Plaintiff appears to concede that Dr. Morton was not a treating source but argues that the ALJ was still required to explain the weight given to Dr. Morton's opinion because of the decision not to assign controlling weight to the opinions of the treating source.  The undersigned agrees.  When considering Dr. Morton's opinion regarding the plaintiff's abilities, the ALJ stated that Dr. Morton's findings:

26

exceed the claimant's own observed abilities to sit for 30 minutes, and conflict with findings showing good range of motion, full strength, and no neurological deficit.  Finally, it appears from the record that Dr. Morton examined claimant but is not a treating source.   Therefore his opinion cannot be accorded controlling weight.

(Tr. 120)

Even though Dr. Morton was not a treating source, the ALJ was required to provide an explanation as to the weight given his opinion.  20 C.F.R. § 416.927(f)(2)(ii) provides that:

> [u]nless the treating source's opinion is given controlling weight, the administrative law judge *must explain in the decision the weight given* to the *opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do* for any opinions from treating sources, *nontreating sources*, and other nonexamining sources who do not work for us. [Emphasis added]

Because the ALJ did not assign controlling weight to the opinion of Dr. Greenwood, she was required to provide an explanation of the weight given to each medical source, including the opinion of nontreating physician, Dr.  Morton.  Consequently, she erred in failing to adequately explain the weight she assigned to Dr. Morton and her reasons for doing so.

### C.   ALJ's Residual Functional Capacity Finding

Finally, plaintiff argues that the ALJ's finding of residual functional capacity failed to include any limitation for plaintiff's severe impairment of migraine headaches.  (Doc. 14, p. 13-14)  Upon review of the ALJ's decision and the questions she asked the VE, the court agrees that the ALJ failed to include any restrictions in her finding of residual functional capacity or in her questions to the VE which were related to plaintiff's migraine headaches.  The ALJ explained that the decision not to include any RFC limitation related to the severe migraine headache condition was due to the absence of any medical opinion limiting plaintiff's functional capacity as a result of her migraines.  The court agrees that no treating or examining source made an

27

explicit connection in that way.  However, Dr. Greenwood (and others) treated plaintiff for migraine headaches for years; and Dr. Greenwood did express the overall functional limitations he saw in his patient.  It seems illusory to conclude that Dr. Greenwood somehow excised the impact of his patient's migraine headaches upon her functional abilities simply because he also indicated that the patient had "subjective" reports of pain.  The subjective pain did not stop him from expressing functional limitations resulting from her other physical conditions. Accordingly, a proper hypothetical question should have included a component relating to the reported migraine headache condition.

A hypothetical question must accurately portray a claimant's physical and mental impairments and a hypothetical that omits restrictions or does not properly convey restrictions to the vocational expert warrants remand.  *Ealy v. Comm'r of Social Security,* 594 F.3d 504, 516 (6th Cir. 2010).  When questioning the VE, the ALJ did not include any limitation in the hypothetical questions related to plaintiff's condition of migraine headaches.  The ALJ acknowledged that plaintiff experienced more frequent migraine headaches at certain times. (Tr. 119)  However, she seems to have minimized this condition and points to medical records stating that plaintiff was experiencing only one headache per week and could eliminate it in 30 minutes with Excedrin.  (Tr. 119)  However, in an earlier paragraph of her decision, the ALJ noted that plaintiff was reporting six migraines a week, lasting all day. (Tr. 119)  Even if the ALJ's finding that the migraines lasted for only a half hour one time per week was supported by substantial evidence in the record, it does not appear that she included this condition in her consideration of the plaintiff' residual functional capacity.  She did not incorporate any limitations for this condition in her questions to the VE and when plaintiff's counsel questioned the VE regarding an individual's need to take off two days per month, the VE testified that such a person would have

28

a difficult time maintaining any job in the local or national economy.  (Tr. 166)  The court should find that the ALJ's failure to incorporate *any* restriction for plaintiff's severe impairment of migraine headaches warrants reversal so that this condition can be reconsidered by the ALJ.

## VIII.   Conclusion

For the foregoing reasons, it is recommended that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Report and Recommendation.

Dated: August 9, 2016

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**